**IN THE COURT OF APPEALS OF IOWA**

No. 20-0228
Filed September 2, 2020

**IN RE THE MARRIAGE OF JEFF MILNE**
**AND ALYSSA MILNE**

**Upon the Petition of**
**JEFF MILNE,**
      Petitioner-Appellant/Cross-Appellee,

**And Concerning**
**ALYSSA MILNE,**
      Respondent-Appellee/Cross-Appellant.
_____

      Appeal from the Iowa District Court for Scott County, Mary E. Howes,

Judge.


      An ex-husband appeals custody, spousal-support, child-support, and

economic provisions in a divorce decree; the ex-wife cross appeals on the custody,

property, and child-support provisions, and seeks to vacate the decree.

**AFFIRMED AS MODIFIED AND REMANDED.**


      Robert S. Gallagher and Peter G. Gierut of Gallagher, Millage & Gallagher,

P.L.C., Bettendorf, for appellant.

      Maria K. Pauly of Maria K. Pauly Law Firm, P.C., Davenport, for appellee.


      Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Jeff and Alyssa Milne divorced after a fifteen-year marriage. Jeff appeals the district court's grant of joint legal custody and joint physical care of their two children. He also challenges the spousal-support, child-support, and economic aspects of the decree. Alyssa cross appeals on the issues of joint physical care, property division, and child support. She also contends the decree is null and void because the district court judge retired the day before filing it. And Alyssa asks for appellate attorney fees.

As a first step, we hold the district court had authority to issue the decree. Next, we modify the decree to place sole legal custody and physical care with Jeff. Based on this modification, we remand for the district court to issue a new visitation schedule and recalculate child support. As for spousal support, we modify the decree to the amount and duration Alyssa requested at trial. We also affirm the economic provisions of the decree. Finally, we decline to award appellate attorney fees to Alyssa.

## I.    Facts and Prior Proceedings

Jeff and Alyssa married in April 2004 in El Paso, Texas. Alyssa was working for the school district as a speech therapist. Jeff serves in the Army. So the couple's moves followed his military career. They lived in Germany from 2005 until 2008. They then returned to El Paso, where their son, C.M. was born in December 2008. Their daughter, A.M., was born in January 2011. Later that year, Jeff deployed to Iraq for four months. He stayed in touch with the family through daily video chats. In 2012, they moved to Kansas. And one year later, the family moved to Davenport. The Army transferred Jeff to the Rock Island Arsenal where he

works in the sustainment command, which oversees logistics for active duty U.S. troops around the world.

On the home front, Alyssa took some part-time jobs as a photographer after the children were born but devoted most of her time to child rearing. In 2013, five-year-old C.M. experienced intestinal trouble and received a diagnosis of Crohn's disease. After further testing, that diagnosis changed to ulcerative colitis. About this same time, Jeff perceived that Alyssa began to impose more restrictions on his participation in hands-on parenting activities. For example, she excluded Jeff from meal preparation, bathing of the children, and laundry duty—based on her concern about the children's exposure to chemicals in commercial household products. Alyssa also nursed both children until they were nearly five years old.

In 2016, Jeff deployed to Amman, Jordan, for six months. When he returned, he learned that Alyssa had "established some diets" for the children, particularly C.M., that were not recommended by their doctors. According to Jeff, Alyssa was feeding C.M. banana pancakes "three meals a day, plus snacks." When asked about their son's diet, Alyssa insisted C.M. "always had choices" but he "loved those" pancakes. Plus, Alyssa restricted C.M.'s gluten and dairy intake, though testing showed he had no allergies to those products. Their son's ulcerative colitis and low weight continued to be a challenge for the parents. At the time of the trial, the parents disagreed whether to follow a doctor's recommendation that C.M. have a colectomy or seek a second opinion. The parents had no health concerns for A.M.

Jeff and Alyssa separated in 2017 and Jeff filed a petition to dissolve their marriage. Their separation was contentious. Each party filed a petition for relief

from domestic abuse in 2017; they later agreed to dismiss the emergency orders of protection. Alyssa again sought a temporary restraining order against Jeff in February 2019, requesting separate parent-teacher conferences. And as the district court found, both parties "inappropriately involved the police" in their disputes over the children on several occasions.

Another key point of disagreement emerged while the parties awaited the dissolution. In November 2017, Alyssa filed an objection to having the children immunized, asserting a religious exemption. Jeff countered that Alyssa's objections were due to "illogical fears" and not beliefs grounded in her religion. The court ordered that Jeff be allowed to have the children vaccinated as recommended by their doctors. In addition to her anti-vaccination stance, Alyssa expressed to Jeff what he believed were irrational concerns about the children's exposure to common objects such as dryer sheets, garden hoses, canned foods, cake sprinkles, and radiation from cell phones. Jeff also testified that the children's counselor spoke to Alyssa about her practice of having the children, who were ten and eight years old, continue to sleep in the same bed with her.

On top of those conflicts, the parents had different views on where the children should attend school. Both A.M. and C.M. attended the Quad City Montessori School. The unaccredited school had an attendance of less than twenty children. Jeff worried about C.M.'s social and academic development because he was the only child in the fourth grade there. Alyssa believed the children were thriving in their current setting and the Montessori school was "very understanding of [C.M.] and his medical needs."

At the time of the divorce trial in 2019, Jeff was forty-six years old. Alyssa was forty-two years old. Jeff earned about $150,000 per year, while Alyssa anticipated earning just under $80,000 per year.[1] The parties owned a home in Davenport valued between $258,000 and $276,000 with a mortgage of about $175,000.

Another asset was Jeff's collection of Lego blocks.[2] Jeff is a Lego aficionado. He attends Lego conferences and volunteers at the children's Montessori school by teaching a STEM class involving Lego construction. After consulting the president of the Des Moines Lego user group and online databases, Jeff valued his Lego collection at $8000 to $10,000. By contrast, Alyssa valued the collection at $45,000. Alyssa also pointed to Jeff's post-separation Lego purchases, totaling more than $18,000, as an example of his dissipation of assets.

In the January 8, 2020 decree, the court awarded the parents joint legal custody. But the court added two exceptions, designating Jeff as "the legal sole decider" on medical and educational issues. The court then awarded the parties joint physical care with the children alternating each week between their parents' homes.

On the property division, the court awarded the marital home to Alyssa and directed that she have it refinanced. The court also found a 2017 bequest of $61,000 from Alyssa's aunt was "hers alone to inherit and keep." The court valued

---

[1] Alyssa testified her 2018 income was about $30,000, but she filed a financial affidavit for child support purposes in 2019 stating her gross monthly income from three part-time jobs was $6660.81 (for an annual gross income of $79,929).

[2] Lego is a toy company that manufactures interlocking studded blocks and minifigures. *See LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 590 (D. Conn. 2019).

Jeff's Lego collection at $25,000. The court split certificates of deposit and marital debts, other than the home mortgage, between the parties. Likewise, the court ordered that pensions and deferred compensation annuities be divided using the *Benson* formula.[3] As for monthly stipends, the district court ordered Jeff to pay child support of $482.88 per month for both children and spousal support of $1000 per month for twenty-four months.

About two weeks later, Alyssa moved to vacate the decree and sought a new trial. The issue was the decretal judge's retirement date. The motion alleged "the honorable Mary Howes' term as judge concluded at midnight on January 7, 2020." Alyssa argued the decree was "null and void" because the judge lacked authority to issue it. The district court denied the motion, citing an order from the acting chief justice of the supreme court assigning Judge Howes to temporary judicial duties past her retirement date.

Jeff appeals and Alyssa cross appeals.

## II. Scope and Standards of Review

We review dissolution appeals de novo. *See In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). We give weight to the decree's factual findings. *Id.* When it comes to the credibility of witnesses, "[t]here is good reason for us to pay very close attention to the trial court's assessment." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (noting appellate courts lack impressions created by

---

[3] *See In re Marriage of Benson*, 545 N.W.2d 252, 256 (Iowa 1996) (dividing portion of defined benefit accrued during marriage by total years of benefits accrued at maturity). In ruling on the parties' motions to amend, the court ordered Jeff's military pensions be divided "in accordance with the years of marriage" using a court order acceptable for processing (COAP).

the parties' demeanors). In custody matters, our overriding concern is the best interests of the children. Iowa R. App. P. 6.904(3)(o). Because we base our decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

We allow the district court "considerable latitude" in fashioning an award of spousal support. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). We intervene only where there is a failure to do equity. *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

When a party challenges the authority of a district court, we review for correction of errors at law. *See In re 2018 Grand Jury of Dallas Cnty.*, 939 N.W.2d 50, 55 (Iowa 2020).

### III. Analysis

### A. Is the decree null and void?

Because the validity of the decree is central to reaching the rest of the issues, we start with Alyssa's claim that Judge Howes was "not a judge" when she rendered her opinion. True, Judge Howes retired as of midnight on January 7. She issued the Milnes' dissolution decree on January 8. The e-filed copy had a time stamp of 5:09 a.m. Later that day, at 3:12 p.m., then Acting Chief Justice David Wiggins filed an order in Scott County district court assigning retired Judge Howes to temporary service under Iowa Code section 602.1612.[4] The order stated her temporary service "begins January 8, 2020 and ends February 7, 2020."

---

[4] District judges "may with their consent be assigned by the supreme court to temporary judicial duties on a court in this state if the assignment is deemed necessary by the Supreme Court to expedite the administration of justice." Iowa Code § 602.1612(1) (2020).

Attached to the chief justice's order was a consent form signed by Judge Howes agreeing to take on temporary judicial duties starting on January 7.

From this timeline, Alyssa urges us to vacate the decree. She first cites *Babcock v. Wolf* for the prosaic notion that a judge's decision must be "made and completed before the expiration of the term of office." 28 N.W. 490, 491 (Iowa 1886). In *Babcock*, the court mulled whether a judge's written decision was "rendered" when the judge deposited it with an express company for delivery to the clerk of court (two days before his term expired on December 31, 1884), or when it was file stamped by the clerk (one day after his retirement). *Babcock* held the judge's decision was "made" before it was handed over to the delivery company. Leaping to modern-day electronic filing, Alyssa contends Judge Howes did not finalize the decree until she uploaded her work onto EDMS at 5:09 a.m., the day after her retirement.

Aside from the difficulty of comparing e-filing to depositing documents with express services in the 1880s, Alyssa's reliance on *Babcock* does not account for the supreme court's remedial order. Yet, in her view, that order "did not close the gap" from midnight on January 7 to 3:12 p.m. on January 8. We disagree. Court orders may have retroactive effect. *See generally Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 525 (Iowa 2003) (noting "judicial decisions generally operate retroactively and prospectively"). As Jeff argues, the supreme court "did not assign any specific timing restrictions to its order; such as 'effective as of the date/time of this ruling.'" Without question, the supreme court intended to "expedite the administration of justice"—a purpose served by issuing the decree drafted by Judge Howes dissolving the Milnes' marriage. Judge Howes was not

obliged to refile the decree after the supreme court issued its order appointing her to temporary service. The original decree was valid.

**B.      Should the parties have joint legal custody or joint physical care of their children?**

As his opening salvo, Jeff argues the district court erred in awarding joint legal custody. Before addressing his argument, we pause to clarify that the decree did not award full "joint legal custody" as that term is defined. *See* Iowa Code § 598.1(3) (listing rights and responsibilities as including "equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction"). Instead, the district court unbundled those rights and made Jeff the "sole decider on medical issues" and "future educational needs" of the children. The court gave the parties joint decision-making authority on religious instruction.

Neither party takes direct aim at the hybrid legal-custody decision. In asking for sole custody, Jeff argues "inherent in that decision" was the court's belief that the parents could not communicate or cooperate about the children's basic needs. In defending the grant of joint legal custody, Alyssa ignores the district court's carve outs for medical and education decisions. For instance, she claims she will "include Jeff in making any medical decisions" despite the fact the current decree reserves those decision for Jeff. And because the parties do not challenge the hybrid legal custody, they cite no authority either allowing or prohibiting this practice.

So we turn to the code. Chapter 598 appears to consider joint custody and sole custody as all-or-nothing propositions. The statute on "custody of children"

allows courts to "provide for joint custody of the child by the parties." Iowa Code § 598.41(1). In fact, when either parent applies for joint custody, the court shall consider ordering equal participation in decision making even if the parents do not agree to joint custody. *Id.* § 598.41(2)(a). If the court grants sole custody to one parent, it must cite clear and convincing evidence that joint custody is unreasonable and not in the children's best interest to the extent that the legal custodial relationship between the children and a parent should be severed. *Id.* § 598.41(2)(b).

These custody statutes do not mention assigning sole decision-making authority for some responsibilities of child-rearing and joint participation for others. *See Hansen*, 733 N.W.2d at 690 ("When joint legal custody is awarded, 'neither parent has legal custodial rights superior to those of the other parent.'"). Yet we have found a smattering of cases where the district court has unbundled the rights listed in section 598.1(3) and (5). *See, e.g.*, *Sloan v. Casey*, No. 15-0921, 2015 WL 9451093, at * 7–8 (Iowa Ct. App. Dec. 23, 2015) (upholding modification of joint legal custody to make one parent solely responsible for scheduling medical appointments for child); *In re Marriage of Bates*, No. 11-1293, 2012 WL 1440340, at *4 (Iowa Ct. App. Apr. 25, 2012) (affirming joint legal custody was unreasonable as it relates to health-care decisions). As it happens, our resolution of Jeff's custody claim allows us to avoid the unbundling issue.

Jeff claims joint legal custody is not in the best interests of C.M. and A.M. To test his hypothesis, we examine these statutory factors:

> a. Whether each parent would be a suitable custodian for the child[ren].

        b. Whether the psychological and emotional needs and development of the child[ren] will suffer due to lack of active contact with and attention from both parents.

        c. Whether the parents can communicate with each other regarding the child[ren]'s needs.

        d. Whether both parents have actively cared for the child[ren] before and since the separation.

        e. Whether each parent can support the other parent's relationship with the child[ren].

        f. Whether the custody arrangement is in accord with the child[ren]'s wishes or whether the child[ren] ha[ve] strong opposition, taking into consideration the child[ren]'s age and maturity.

        g. Whether one or both of the parents agree or are opposed to joint custody.

        h. The geographic proximity of the parents.

        i. Whether the safety of the child[ren] . . . or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation. [5]

Iowa Code § 598.41(3). We also consider the factors listed in *In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974), including the characteristics of each child and the characteristics of each parent.

On the side of joint custody, both Jeff and Alyssa actively cared for the children before and since the separation. And they live in close geographic proximity. Tipping the other way, Jeff is opposed to joint custody. And although Alyssa defends the grant of joint custody in the decree, her view of the acrimony in their relationship aligns with Jeff's perception. Both parents accurately portray their inability to communicate effectively about their children's needs. The heights of animosity between the parents—showcased through their calls to the police and mutual protective orders—pose serious questions about their ability to support the

---

[5] We don't find relevant the factors in paragraphs (j) (history of domestic violence) or (k) (exposure to sex offenders). On the domestic-violence issue, the parties filed dueling petitions under Iowa Code chapter 236 but neither proved the other engaged in a pattern of abuse.

other parent's relationship with the children. We find clear and convincing evidence that the relationship between Jeff and Alyssa is too toxic to support joint legal custody. *See In re Marriage of Weidner*, 338 N.W.2d 351, 358 (Iowa 1983) (holding joint custody not likely to be successful when parents were "unable adequately to communicate with each other regarding their children's needs").

With the scales tipping toward sole custody, we next examine the suitability of each parent to be the primary custodian and the impact of the lack of active contact and attention from both parents. Legal custody carries the right to make the big decisions affecting a child's life, including choices about health care, education, religion, and extracurricular activities. *See Hansen*, 733 N.W.2d at 690. After hearing the evidence and observing the parties, the district court did not feel comfortable with Alyssa making decisions about the children's medical or educational needs. In short, the court did not believe she was a suitable custodian when it came to making the most critical decisions about the children's healthy development. In carving out those key categories, the decree mandated a situation closer to sole legal custody than joint legal custody. In our de novo review, we take the logical step to award sole custody to Jeff. Like the district court, we view Jeff as the more grounded guide for the children when it comes to choices about their health and well-being. Alyssa is prone to conspiracy theories and overblown fears inconsistent with medical and developmental advice. This susceptibility could lead to long-term harm for the children. Her battle against having them vaccinated is a prime example.

And even before the separation, Alyssa took measures to diminish the closeness of Jeff's relationship with the children. Jeff testified he urged marital

counseling from 2013 through 2017 because he "wanted to be more involved with the family and the family-related decisions, and Alyssa was making a lot of those decisions on her own." Against that backdrop, clear and convincing evidence supports awarding sole legal custody to Jeff. *See In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996) (upholding award of sole legal custody to father when mother was unwilling to support his relationship with children).

Having decided that clear and convincing evidence supports awarding sole legal custody to Jeff, the subsidiary question of physical care answers itself. Physical care involves "the right and responsibility to maintain a home" for the children and provide their routine care. *Hansen*, 733 N.W.2d at 690. Considering the list in section 598.41(3), as well as the *Winter* factors, we find placing physical care with Jeff will be in the children's best interests. We recognize a reduction in their "active contact" with Alyssa may be an adjustment for the children. She has cultivated a very close relationship with them, at times to the detriment of their equal interactions with Jeff. Yet all in all, we find perpetuating the conflict inherent in these parents' joint decision-making will be more detrimental to the children than moving away from shared physical care. *See In re Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016) (recognizing parental discord disrupts children's lives); *Hansen*, 733 N.W.2d at 698 ("[E]xpressions of anger between parents can negatively affect children's emotions and behaviors.").

Given these modifications to the legal custody and physical care provisions, we remand for court to set a visitation schedule and recalculate child support payments.[6]

### C.      Was the spousal support award equitable?

At trial, Alyssa asked for monthly spousal support of $1250 for two and one-half years.   After accepting Alyssa's financial statement that her 2019 income would be just under $80,000 per year (half as much as Jeff was earning), the district court ordered Jeff to pay $1000 per month for two years.   Then Alyssa moved to enlarge and amend the decree, alleging her annual income was only $10,860.  The court found merit in Alyssa's assertion that she would need more than $1000 per month to stay in the house.  So the court amended the decree to order Jeff to pay $2500 per month for two years.

On appeal, Jeff argues the motion to enlarge contradicted Alyssa's trial testimony, as well as her financial affidavit.   He argues Alyssa, as a licensed speech pathologist, is able to earn far more than $10,000 per year.   In his view, she is not entitled to any spousal support but, at a minimum, the original amount of $1000 per month was equitable.  In general, Alyssa defends the spousal support order.  But in passing she complains that Jeff should contribute to her support "for a much longer time than a 24 month period."  Alyssa acknowledges she is a trained professional but claims to have sacrificed her own career to raise the children and advance Jeff's military endeavors.

---

[6] Because of that remand, we need not address the parties' arguments concerning the current child-support award.

The district court did not specify the kind of spousal support awarded. We recognize three kinds: "traditional, rehabilitative[, and] reimbursement alimony." *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015) (citing *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005)). Sometimes those categories overlap. *See In re Marriage of Becker,* 756 N.W.2d 822, 827 (Iowa 2008). The Milnes' marriage did not last long enough to merit serious consideration for traditional alimony. *See Gust*, 858 N.W.2d at 410–11 (discussing twenty or more years as the common "durational threshold" for traditional spousal support). And no other factors weigh in favor of permanent spousal support. Alyssa acknowledged her ability to work full time. In fact, she juggled three part-time jobs during the separation. Because she spent time out of the workforce when the children were young and Jeff was deployed, we find rehabilitative alimony would be appropriate to help her through a limited period of retraining following the divorce. *See Becker*, 756 N.W.2d at 826.

In determining a spousal support award, we consider the factors in Iowa Code section 598.21A(1) including (1) the marriage's length; (2) the parties' ages and physical and emotional health; (3) the property distribution under section 598.21; (4) the educational attainments of the parties; (5) their relative earning capacities; (6) the feasibility of the party seeking maintenance to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage and the length of time necessary to achieve this goal; (7) tax consequences; and (8) any mutual agreements. This marriage was neither short nor long. The parties are still relatively young, enjoy good health, have college degrees, and solid work histories. But given their division of child-rearing duties

during the marriage, Jeff has a significantly higher earning capacity than Alyssa does. That final distinction calls for an award of spousal support. Alyssa testified at trial that $1250 per month for two and one-half years was a fair amount. We agree and modify the decree to award her $1250 per month for thirty months.

**D.     Should the district court have included a check from Alyssa's aunt for $61,825 in the marital estate?**

After her Aunt Louise died in 2017, Alyssa received a check for $61,825. It was a "resident refund" from Westminster Manor, the senior community in Austin, Texas, where the aunt lived. Five years earlier, the aunt sent an email to Alyssa and Jeff explaining that she had paid an annuity to Westminster when she moved in and they would be receiving a refund when she died. The aunt closed by saying: "I want you to know how proud I am of both of you and what an honor it is to contribute to the education and training for two (?) wonderful children." Also in 2012, while she was still alive, the aunt gave a gift of $240,000 to Alyssa and Jeff.

The district court determined that initial gift qualified as marital funds. But the court decided the Westminster refund belonged to Alyssa alone. Jeff challenges that second decision, contending the $61,825 was subject to equitable division in the decree.

The resolution of his contention starts with Iowa Code section 598.21(5). That statute requires divorce courts to "divide all property, except inherited property or gifts received or expected by one party, equitably between the parties" after considering a host of factors. *See* Iowa Code § 598.21(5)(a)–(m). Inherited property or gifts received by either party before or during the marriage is the property of that party and is not subject to property division in the divorce "except

upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage." *Id.* § 598.21(6).

In deciding if it would be equitable to divide the gift from Alyssa's aunt, we consider: (1) the parties' contributions toward the property's preservation; (2) the existence of any independent close relationship between the aunt and Jeff; (3) the parties' separate contributions to their economic welfare to whatever extent those contributions preserve the property for either of them; (4) any special needs of either party; and (5) any other matter which would render it "plainly unfair" to Jeff or the children to set aside the property for Alyssa's exclusive enjoyment. *See In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013). As part of considering those five factors, we weigh the length of the marriage and the length of time the party or parties held the property after receiving it. *See In re Marriage of Fall*, 593 N.W.2d 164, 166 (Iowa Ct. App. 1999).

In seeking to modify the decree, Jeff points to the aunt's email that was addressed to both him and Alyssa. He also cites the aunt's expressed belief that the money would go toward the children's education. To counter, Alyssa notes the check was made out only to her. She also complains that Jeff misused the earlier $240,000 received from her aunt by withdrawing it from education accounts established for the children. Alyssa testified she was hesitant to cash the later check until she and Jeff discussed what to do with the money. She wanted to use the money to fund trips for the children to see their maternal grandmother more often or to hire additional help for C.M.

In addressing Jeff's challenge, we first find Louise intended her niece Alyssa to be the sole recipient of the refund check. *See Liebich*, 547 N.W.2d at 850. As

proof of that, Westminster addressed the check to Alyssa alone.  Second, we find nothing inequitable in nondivision of the refund.  *See id.*  Alyssa intended to preserve her aunt's gift for specific purposes benefitting the children.  And other than the aunt's salutation to both Jeff and Alyssa in her email, nothing in the record reveals Louise had an independent, close relationship with Jeff.  Still, Jeff had access to the earlier, larger gift from the aunt.  And Jeff has not highlighted any special needs or other reasons that it would be unjust for Alyssa to have sole rights to the refund.  We affirm on this issue.

**E. Did the decree equitably distribute marital assets and debts?**

Jeff next argues the district court inequitably divided their assets and debts.

He provides the follow chart to illustrate the division.[7]

| Asset/Debt | Jeff | Alyssa |
|---|---|---|
| Marital Home Equity | | $100,945 |
| 2014 Honda Pilot | $21,067 | |
| 2011 Toyota Sienna | | $12,029 |
| Roth IRA (Jeff) | $3991.16 | $3991.16 |
| Roth IRA (Alyssa) | | $30,049.72 |
| Thrift Savings Plan | $70,545.25 | $70,545.25 |
| Wells Fargo IRA | | $19,563 |
| Teachers Retirement Account | | $23,085.69 |
| USAA Fixed Rate CD for C.M.'s college | $35,417.30 | $35,417.30 |
| USAA Fixed Rate CD for A.M.'s college | $34,236 | $34,236 |
| Legos | $25,000 | |
| **Total:** | **$190,265.71** | **$329,862.32** |

Jeff recognizes district courts are not required to evenly divide assets. *See*

*Hansen*, 733 N.W.2d at 702 ("An equitable division is not necessarily an equal

division."). But he claims the 36/64 split in Alyssa's favor failed to achieve equity.

Jeff also asks us to modify the district court's orders dividing his retirement

accounts. He objects to paying the costs of the surviving spouse annuity of his

---

[7] Jeff acknowledges that because the district court divided the retirement accounts under the *Benson* formula, the exact value of each party's share was unavailable.

Federal Employee Retirement System (FERS) account and contends we should calculate the marital share of his accounts from the date of the parties' separation.

In response, Alyssa does not dispute Jeff's math. But she insists the division was fair because the district court was accounting for Jeff's withdrawals and spending during the pendency of the dissolution petition. She contends Jeff "drained" the parties' bank accounts of $232,000 in June 2017. She also claims Jeff dissipated assets by spending $18,250.46 on Legos and $10,250 on vacations after the parties entered a stipulation in August 2017 enjoining them from spending beyond household expenses, attorney fees, and other litigation costs.[8] In reply, Jeff denies dissipating marital assets and points to evidence in the record accounting for spending on family expenses.

In most cases, it is equitable to value the marital assets as of the trial date. *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). But an alternate valuation date may be fair in certain circumstances. *Id.* Jeff does not make a compelling case for changing the valuation date for his retirement accounts. He claims a "significant delay in the trial process" and the timing of the decree prejudice him financially but does not explain how. We discern no reason to depart from the traditional valuation date. Neither do we find it inequitable to order Jeff to pay the full cost of the surviving spouse annuity.

True, the division of assets was far from a fifty-fifty split. But it was equitable. We decide what is a just division based on section 598.21(5). *See*

---

[8] In ruling on Alyssa's motion to enlarge, the district court characterized Jeff's recent spending on Legos as "extremely irresponsible" but stopped short of finding Jeff in contempt for dissipation of marital assets.

*McDermott*, 827 N.W.2d at 678. The driving factors here are the unequal earning capacities of the parties and Alyssa's contributions to Jeff's military career by maintaining their home through many transfers and deployments. We also consider the property settlement in tandem with the spousal support, which we reduced for the reasons discussed above. *See In re Marriage of Lattig*, 318 N.W.2d 811, 815 (Iowa Ct. App. 1982) ("When asked to review an individual economic provision of a dissolution decree, we consider all the provisions together as an integrated whole."). All things considered, we decline to modify the property division.

### F.    Is Alyssa entitled to appellate attorney fees?

Finally, Alyssa asks us to order Jeff to pay her attorney fees on appeal. We decline to do so. An award of attorney fees is not a matter of right, but rests within our discretion. *In re Marriage of Scheppele*, 524 N.W.2d 678, 680 (Iowa Ct. App. 1994). We consider Alyssa's needs, Jeff's ability to pay, and the relative merit of their positions on appeal. *Id.* Here, each party succeeded on some appellate issues. And both parties have the ability to pay their own attorney fees. We order Jeff to pay the costs of the appeal.

**AFFIRMED AS MODIFIED AND REMANDED.**

Schumacher, J., concurs; Vaitheswaran, P.J., partially dissents.

**VAITHESWARAN, Judge** (concurring in part and dissenting in part).

I respectfully dissent from those portions of the majority opinion granting Jeff sole legal custody and physical care of the children.

I agree our dissolution statute provides for two forms of legal custody: joint and sole. I, too, would find it unnecessary to reach the question of whether custodial rights may be unbundled, but for a different reason than articulated by the majority. In my view, the record lacks evidentiary support for the district court's decision to unbundle those rights.

The district court first carved out medical decisions from the joint-legal-custody bundle. The court concluded Alyssa was "not capable of making the correct medical decisions for the children." The court cited Alyssa's "misguided beliefs," the most notable being her reluctance to have the children immunized.

Alyssa conceded she was initially opposed to vaccinations. But she also stated she fully complied with the court order requiring her to obtain them. The following exchange is instructive:

> Q. Okay. Have you been found in contempt for violating that order? A. No.
> Q. Has anyone accused you of not vaccinating your kids? A. No.
> Q. Have you taken the kids to all of their vaccine appointments? A. Every single one.
> Q. Has Jeff ever had to do that? A. No.
> Q. Has Jeff had to take the kids because you refused to do that? A. No.
> Q. Do you understand now that the court system takes the approach that children should be vaccinated? A. Yes.
> Q. Are you willing to continue to vaccinate your kids? A. Yes.

In short, Alyssa adhered to the statutory immunization requirement after the district court ruled against her on her exemption request. *See* Iowa Code § 139A.8(1)

(requiring immunization of children, "subject to the provisions of subsection[ ] . . . (4)); 139A.8(4)(a)(2) (not requiring immunizations if a parent "submits an affidavit . . . stating that the immunization conflicts with the tenets and practices of a recognized religious denomination of which the applicant is an adherent or member"). In light of her compliance with the court order, I do not believe her initial reluctance to immunize the children was grounds to strip her of her joint legal right to make medical decisions on behalf of the children.

On a related note, the district court found Alyssa did not "believe in modern medicine." At the same time, the court found she favored a surgical procedure for the older child that was recommended by her physician. The court did not attempt to reconcile these contradictory findings. In fact, Jeff was the parent who balked at proceeding with surgery. He obtained a second opinion at Mayo Clinic, a visit he recorded and transcribed. At the scheduled appointment, Alyssa did not disparage medications, as the district court also found, but indicated she was pleased with the effect of a medicine that was added to the child's regimen. She also appeared amenable to certain testing proposed by the physician and agreed with Jeff that their regular physician, as well as the surgeon slated to perform the surgery, would not oppose a delay in the surgery to perform the tests. Jeff reiterated his interest in "options . . . to avoid surgery." In my view, the second-opinion conference underscores Alyssa's willingness to abide by the prescriptions of modern medicine.

In conjunction with the medical-care issue, the district court found that Alyssa placed the older child on a "restrictive diet" not recommended by health care providers. But the record discloses that it was a physician who initially

recommended removal of dairy products from the child's diet to see if the change would ameliorate certain abdominal issues. According to Alyssa, "He said there was not a test that we could give, so we needed to use observation." Although Jeff pointed out the physician "never said that there was [some] type of scientific reason to remove dairy," he did not deny that the recommendation came from a physician. As for Alyssa's avoidance of gluten in the child's diet, she conceded she made the change on her own, but she informed the Mayo physician of her decision and asked, "[D]o you have a test you can give us to tell us which foods cause problems?" The physician responded, "I wish it was that simple."

Notably, a dietician at the University of Iowa Hospitals and Clinics recommended "soy products" to cover the "[d]airy category" and recommended alternatives to gluten, essentially contradicting the court's finding that Alyssa's fear of dairy products and gluten was irrational. The dietician stated,

> [T]here really isn't one trigger that everyone has, as far as increasing abdominal pain or stool output. I will say the most common ones I have seen in my kiddos are dairy, and actually wheat, but not everyone will respond to both of those. The majority of them, if they have a trigger, it is to dairy.

At one point in the conversation, Jeff asked, "[s]o we agree on soy, Alyssa?" Alyssa responded, "Okay." In light of this exchange, Jeff's criticism of Alyssa for giving the child soy milk rather than dairy milk rings hollow.

The district court also found Alyssa "developed a fear of the children having sugar, even though they were underweight." In fact, Alyssa fed the children honey, which the hospital dietician stated "is pretty high in sugar." She also purchased donuts for the children to increase the older child's caloric intake, a practice that contradicts the district court's finding that she did "not seem to . . . understand that

he should have foods to help him gain weight." Although the donut purchases may have deviated from the dietician's recommendation to add "really small portions" of processed sugar to the older child's diet, both parents were prone to this deviation, with Jeff conceding he regularly served the children ice cream.

In a related vein, Jeff faulted Alyssa for purchasing organic meat but did not suggest the meat had less nutritional value than the cheeseburgers and ham-and-cheese sandwiches he fed the children. The parents fed the children on an equal basis and both recognized the importance of the physician's recommendation to give the older child extra protein and fat. Alyssa attempted to do so by "put[ting] extra slices of meat" on his sandwiches and "slather[ing]" them with mayonnaise.

The district court additionally took issue with Alyssa's decision to feed the child egg and banana pancakes for a period of time. The court found that "[n]utrionists" told her "that [was] not the correct way to feed" the child. To the contrary, the hospital dietician recognized that fruit would have to be given to the child in pureed form and she suggested the addition of applesauce or peaches to the pancakes to enhance their fruit content. She also recommended pureed baby foods for the child, a suggestion the ten-year-old categorically rejected. Notably, Alyssa had long since stopped serving the pancakes, rendering that particular "dietary restriction" a moot point.

I would conclude the record does not support the district court's determination that Alyssa ignored or minimized medical advice or professional dietary recommendations. Accordingly, I would modify the dissolution decree to return medical decision-making to the joint-legal-custody bundle.

I turn to the district court's decision to divest Alyssa of input into educational decisions. The district court found that Alyssa enrolled the children in a private Montessori school, whereas Jeff preferred to have the children attend public schools. The court concluded it was "in the children's best interest for Jeff to make their educational decisions." Again, I find scant evidentiary support for the district court's decision to remove educational decisions from the joint-legal-custody bundle.

Preliminarily, the suggestion that Jeff had no input into the decision to enroll the children at a Montessori school is belied by his testimony that "[w]e both" signed the children up initially. The first time he objected to their enrollment at the school was after he filed the dissolution petition. He testified "an aspect of" his objection was the expense.

Nor does the record support the suggestion that the children suffered educationally or socially at the Montessori school or that the school was "insufficient to meet [the children's] current and future educational needs." Their teacher, who had a degree in elementary education and had been teaching for seventeen years, testified "[t]hey love coming to school. They love learning. They explore different avenues that interest them. They are both fabulous readers and writers and artists." She stated their performance was above average relative to children throughout the State and, given the smaller class sizes, she was able to provide more one-on-one time with the students. Another teacher, who had Montessori certifications and more than fifty years of teaching experience, stated the older child is "a very bright boy, and he is doing very well."

As for the curriculum, a teacher testified the school had a syllabus to apprise the teachers "what the standards are for each grade." Additionally, parents could opt to have the children take the standardized tests given at the public schools after third grade. Parents also were required to file a statement with the local school district attesting that they were "providing . . . competent private instruction." And, although the Montessori philosophy focused on "individualized education," the children were not in a classroom by themselves. Nine children, including the older child, were in what the school classified as "upper elementary," and eleven children, including the younger child, were in "lower elementary." One of the teachers testified the children would have no problem transitioning into a public school setting at a later point and they could "dual enroll" and "have access to all of [the public school's] special services," including "athletics [and] any classes that they might want to take."

Because I believe the record does not support the district court's determination that Alyssa made poor educational choices, I would return education to the joint-legal-custody bundle.

All this is a long way of saying I believe Alyssa was entitled to joint legal custody of the children as the term is statutorily defined. *See In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) ("When parties are awarded 'joint legal custody,' 'both parents have legal custodial rights and responsibilities toward the child' and 'neither parent has legal custodial rights superior to those of the other parent.'"). I would modify the decree to grant her full joint custodial rights.

Remaining for discussion is the district court's decision to grant the parents joint physical care of the children. I would affirm that portion of the decree. The

district court stated, "Both parents [were] loving parents that provid[ed] enriching activities for the children." I agree.

I recognize the parents' animosity towards each other was a factor weighing against joint physical care. *See In re Marriage of Hansen*, 733 N.W.2d 683, 698 (Iowa 2007) (citing the degree of conflict between the parents as a factor for consideration in the joint-physical-care determination). But, in my view, much of the dissension amounted to legal posturing, and Jeff was equally to blame.

Notably, the parents worked together on important matters involving the children, including the older child's health needs; both were actively involved in the children's daily lives; and, at the end of the day, both appeared to have the children's best interests at heart. Once the rancor of these proceedings is behind them, I trust they will minimize conflict for the sake of the children.